**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RANDOLPH TOWNSHIP BOARD OF EDUCATION, | Civil Action No. 22-01762 (JKS)(CLW) |
| Plaintiff, | **OPINION** |
| v. | May 13, 2024 |
| M.T. and I.T. o/b/o M.T., | |
| Defendants. | |

**SEMPER**, District Judge.

Before the Court are cross-motions for summary judgment filed by Plaintiff Randolph Township Board of Education (the "District") and Defendants M.T. and I.T. on behalf of their son, M.T. ("Defendants"), pursuant to Federal Rule of Civil Procedure 56. (ECF 46, 47.) This special education matter comes before the Court on the District's appeal of the Administrative Law Judge's ("ALJ") February 22, 2022 decision ("Final Decision") granting Defendants' due process petition. (ECF 1.) The Court has jurisdiction over this matter under 20 U.S.C. § 1415(i)(2). The Court has carefully considered the parties' submissions and decides the motions without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Rule 78.1(b). For the following reasons, the Court **DENIES** the District's motion, **DENIES** Defendants' motion, and **REMANDS** this matter to the ALJ for further proceedings consistent with this Opinion.

## I.   BACKGROUND

The Court first provides the legal framework governing this special education matter pursuant to the Individuals with Disabilities Education Act ("IDEA") to contextualize the factual and procedural history.

### A.  Statutory Framework: Individuals with Disabilities Education Act

Congress enacted the IDEA to ensure that children with disabilities receive a free appropriate public education ("FAPE"). *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 179-83 (1983) (recounting the history and purpose of the IDEA); *see* 20 U.S.C. § 1412(a)(1). Under the IDEA, public educational institutions must evaluate, "identify[,] and effectively educate" disabled students by providing them with a FAPE or, alternatively, "pay for their education elsewhere if they require specialized services that the public institution cannot provide." *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009); *see D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d Cir. 2012). A FAPE "consists of educational instruction specially designed to meet the unique needs of the . . . child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley*, 458 U.S. at 188-89; *see School Dist. of Philadelphia v. Kirsch*, 722 F. App'x 215, 222 n.5 (3d Cir. 2018).

A public education institution provides a FAPE by way of an "individualized education program" ("IEP"), which is the cornerstone of the IDEA. 20 U.S.C. § 1414(d). A child's IEP is a written document that must include several elements such as the child's present level of performance and measurable yearly goals in light of the child's disability. *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 264 (3d Cir. 2003) (citing 20 U.S.C. § 1414(d)(1)(A)).[1] The

---

[1] New Jersey's rules regarding the development of an IEP mirror federal requirements. *S.H.*, 336 F.3d at 264; N.J. Admin. Code § 6A:14-3.7. In addition, Section 6A:14-2.7 of New Jersey's Administrative Code includes the parallel state procedures relevant to the instant action.

IEP must also state "'the special services that the school will provide'" the child. *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012) (quoting *Schaffer v. Weast*, 546 U.S. 49, 53 (2005)). The IEP "must be 'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the student's 'intellectual potential.'" *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004) (citing *Rowley*, 458 U.S. at 206-07). Once a child's educational program is determined, the school district must attempt to place the child in the "least restrictive environment." 20 U.S.C. § 1412(a)(5).

The least restrictive environment "is one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 535 (3d Cir. 1995). The requirement establishes a strong preference for mainstreaming disabled children by educating them with non-disabled children to the maximum extent possible. *See, e.g.*, *S.H.*, 336 F.3d at 265; *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 578 (3d Cir. 2000) (finding that the mainstreaming component of the IDEA requires that a disabled child is placed in the "least restrictive environment . . . that will provide him with a *meaningful* educational benefit") (emphasis added). Many have interpreted the IDEA to articulate a strong congressional preference for "integrating children with disabilities in regular classrooms." *Oberti v. Clementine Bd. of Educ.*, 995 F.2d 1204, 1213-14 (3d Cir. 1993).

In *Oberti*, the Third Circuit articulated a two-part test to determine whether a school district is in compliance with the IDEA's mainstreaming requirement. First, the court must determine "'whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily.'" *Id.* at 1215 (quoting *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036,

1048 (5th Cir. 1989)).[2] Second, if the court finds that placement outside of a regular classroom is necessary for the child to benefit educationally, then the court must decide "whether the school has mainstreamed the child to the maximum extent appropriate[.]" *Oberti*, 995 F.2d at 1215 (quoting *Daniel R.R.*, 874 F.2d at 1048); *see also T.R.*, 205 F.3d at 579-80 (requiring the school district to consider "a continuum of possible alternative placement options when formulating an IEP"). This analysis requires an inquiry into "whether the school has made efforts to include the child in school programs with non[-]disabled children whenever possible." *Oberti*, 995 F.2d at 1215.

Under the IDEA, dissatisfied parents may challenge a school district's determinations in an administrative proceeding. *See* 20 U.S.C. § 1415(b)(6)-(7). In New Jersey, parents may file a complaint with the state's Office of Administrative Law ("OAL") (N.J. Admin. Code § 6A:14-2.7), and seek an impartial due process hearing regarding "the identification, evaluation, or educational placement of the[ir] child, or the provision of a [FAPE] to such child . . . ." 20 U.S.C. § 1415(b)(6)(A); *see also* 20 U.S.C. § 1415(f)(1)(A). Furthermore, the administrative process delineated under the IDEA "is conducted in compliance with state procedures." *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272 (3d Cir. 2014) (citing 20 U.S.C. § 1415(f)(1)(A)). A party who is dissatisfied with the outcome of an administrative decision rendered under 20 U.S.C. § 1415(f) may file an appeal in "any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). Accordingly, this Court has jurisdiction over the present dispute. *See id.*

---

[2] The court should consider three factors:

(1) whether the school has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular classroom with supplementary aids and services, as compared to the benefits provided in a special education classroom; and (3) the possible negative effect the child's inclusion may have on the education of the other children in the regular classroom.

*Oberti,* 995 F.2d at 1217-18.

"Parents may unilaterally place their child at a different school, but are eligible for reimbursement from the school district if, and only if, the school district has not offered the student a FAPE." *J.F. v. Byram Twp. Bd. of Educ.*, 812 F. App'x 79, 81 (3d Cir. 2020) (citing *Shore Reg'l*, 381 F.3d at 198); N.J. Admin. Code § 6A:14-2.10(d). Thus, when parents seek reimbursement for a unilateral placement, the first inquiry is whether the school district offered a FAPE. *Shore Reg'l*, 381 F.3d at 198. The school district must show that "it complied with the procedures set out in the IDEA and that the IEP was 'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the child's 'intellectual potential.'" *Shore Reg'l*, 381 F.3d at 199 (citing *Rowley*, 458 U.S. at 206-07). If the school district offered a FAPE, then "no reimbursement is required." *Shore Reg'l*, 381 F.3d at 198 (citing N.J. Admin. Code § 6A14-2.10(a)).

If, however, the school district did not provide a FAPE, the second inquiry is whether the parents acted appropriately in removing the child from the school district. *Shore Reg'l*, 381 F.3d at 199. "[P]arents who . . . 'unilaterally change their child's placement during the pendency of [IDEA] review proceedings' . . . are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993) (quoting *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 373-74 (1985)).

### B.  Factual Background[3]

M.T. was born on October 25, 2008. (District's SUMF ¶ 2.) At all relevant times, M.T. resided in the Township of Randolph. (*Id.* at ¶ 3.) In 2016, M.T. was referred to the Child Study

---

[3] The factual background is drawn from the parties' statements of material undisputed facts, including the record materials cited therein, (*see* ECF 46-5 ("Defs' SUMF"); ECF 47-3 ("District's SUMF")), and the ALJ's final decision, (ECF No. 46-4 ("Final Decision"). This Court treats a material fact as undisputed if it is uncontested in the parties' responses to the statements (*see* ECF 90-1; ECF 91-4), or otherwise supported by "materials in the record," Fed. R. Civ. P. 56(c)(3).

Team for evaluation and classification for eligibility to receive special education services. (Final Decision at 17, ¶ 5; ECF 55-1 at P-1.) M.T.'s IEP classification reflected "Other Health Impaired." (Final Decision at 17, ¶ 6; ECF 55-1 at P-2.) In third grade, M.T. participated in general education subjects, reading, language arts, math, science, and social studies, which were co-taught by general education and special education teachers. (Final Decision at 17, ¶ 7.) At the beginning of fourth grade, M.T. began exhibiting signs of difficulty in the general education classroom. (*Id.* at 18, ¶ 8.) Accordingly, an IEP meeting was held on October 25, 2018, and M.T.'s IEP was revised to provide supplemental math instruction twice a week. (*Id.* at 18, ¶ 9; ECF 55-2 at P-6; ECF 51-1 at R-3.)

On November 20, 2018, the parties met to plan M.T.'s reevaluation, which was to include an educational evaluation, psychological evaluation, and speech/language evaluation. (Final Decision at 18, ¶ 10; ECF 55-1 at R-4.) An educational testing of M.T. was conducted on November 30, 2018, which revealed he had difficulty with comprehension, his writing skills fell in the low range, and that M.T. appeared "anxious and angry," when tasked with a timed writing task. (Final Decision at 18, ¶ 12; ECF 51-2 at R-5.) Thereafter, on December 12, 2018, a psychological evaluation was conducted by Cosette Sobota, a psychologist and member of the Child Study Team, which revealed M.T. to be a student of low average intelligence as shown on the Wechsler Intelligence Scale for Children – Fifth Edition. (Final Decision at 18, ¶ 14; ECF 51-2 at R-6.) The psychological evaluation also supported specific behavioral concerns as reflected Behavioral Assessment System for Children – Third Edition. (Final Decision at 18, ¶ 15; ECF 51-2 at R-7.) In December 2018, a speech and language evaluation was conducted by Kristen Halikias, M.S. CCC-SLP, and a report was provided on January 7, 2019. (Final Decision at 18, ¶ 17; ECF 55-6 at P-25; ECF 51-2 at R-8.) The testing revealed M.T.'s language abilities fell at the 7th

percentile and his listening comprehension skills were at the 12th percentile on the Clinical Evaluation of Language Fundamentals. (Final Decision at 18, ¶ 17) M.T.'s score on the Oral Passage Understanding Scale was also at the 12th percentile. (*Id.*) On December 17, 2018, the parties met and revised M.T.'s IEP to place him in a resource center for reading, language arts, and math and provide him with weekly counseling sessions and speech-language therapy twice a month. (Final Decision at 18, ¶¶ 16, 18; ECF 55-2 at P-7; ECF 51-2 at R-7.)

Thereafter, on January 17, 2019, the parties met again as part of M.T.'s annual reevaluation to determine M.T.'s continued eligibility for special education services. (Final Decision at 19, ¶ 19; ECF 55-2 at P-8; ECF 51-3 at R-9.) M.T.'s IEP was updated to reflect the data from the Child Study Team's reevaluation, increase the frequency of special-language therapy to twice per week, and offer M.T. participation in an Extended School Year Program. (ECF 55-2 at P-8; ECF 51-3 at R-9.)

On February 19, 2019, M.T.'s parents sent a letter to Ms. Sobota expressing "there [wa]s a large behavioral piece with [M.T.] either shutting down or getting angry" and requesting a Functional Behavioral Assessment ("FBA") to be performed as soon as possible. (ECF 55-6 at P-27; ECF 51-3 at R-10.) An FBA was subsequently conducted, and a report was provided on April 25, 2019. (ECF 55-6 at P-27; ECF 51-3 at R-12.) Defendants communicated with the District on multiple occasions expressing behavioral issues with M.T. (Final Decision at 19, ¶¶ 24, 26-29.)

On May 17, 2019, M.T.'s IEP was amended to change his supports for science and social studies from in-class resource to support from a paraprofessional because Ms. Sobota and Petitioners agreed that the teacher who was scheduled to provide the in-class supports would not be a good fit for M.T. (Final Decision at 20, ¶ 30; ECF 55-3 at P-9; ECF 51-3 at R-15.) M.T.'s IEP was also amended to reflect M.T. would not be attending the Extended School Year Program

because he was attending summer camp that conflicted with the Extended School Year Program. (Final Decision at 20, ¶ 31; ECF 55-3 at P-9; ECF 51-3 at R-15.)

When M.T. started the 2019-2020 academic year, his behavioral issues at home accelerated and Defendants enrolled him in counseling with Perform Care after he went after his father with a knife. (Final Decision at 20, ¶ 32.) In January 2020, M.T.'s behavior at home further declined and he became verbally abusive to family members, would not complete routine household chores, and did not focus on his schoolwork. (*Id.* at 20, ¶ 36.)

On January 14, 2020, M.T. ran from the school building and toward a busy street. (Final Decision at 20, ¶ 37; ECF 55-6 at P-29; ECF 51-3 at R-18.) M.T. was restrained and returned to a nearby classroom. (Final Decision at 20, ¶¶ 38-39; ECF 55-6 at P-29; ECF 51-3 at R-18.) M.T. made several threats about harming himself. (ECF 55-6 at P-29; ECF 51-3 at R-18.) Defendants were contacted and asked to pick M.T. up from school. (Final Decision at 20, ¶ 40.) Because the incident involved threats made by M.T., per District policy, the District required mental health clearance before M.T. could return to school. (Final Decision at 21, ¶ 41; ECF 55-6 at P-29; ECF 51-3 at R-18.) Defendants were given the choice of having M.T. evaluated by Saint Clare's Hospital, the school's designated mental health facility, or by their own psychologist.[4] (Final Decision at 20, ¶ 41.) The Restraint and Seclusion Reporting Form also indicated a "[b]ehaviorist was consulted and will help devise a plan for re-entry" and "[a] SAGE[5] referral was initiated." (ECF 55-6 at P-29; ECF 51-3 at R-18.)

---

[4] On January 15, 2020, Defendants had reached out to Kelly McLaughlin, a social worker from Perform Care, and asked for "feedback . . . in regards to [the] incident." (ECF 55-10 at P-52, P600.) Ms. McLaughlin indicated it would be "hard to evaluate to do the fact [she] had not seen [M.T.] since prior to Christmas/holiday break[,]" but recommended "other facilities that offer[ed] a higher level of care like High Focus Centers and Stepping Forward that could also provide a clearance or a higher level of care that [M.T.] may need at this time." (*Id.*)

[5] The Sage Program is "designed to fill the gap in service between the existing in-school support and an out-of-district placement. It generally serves classified students at RMS who are presenting with emotional difficulties that are affecting their academic and social functioning." (ECF 55-6 at P-30.) "Students and parents have to consent to be a part of the program[.]" (*Id.*) Even though M.T. was on home instruction, Sage counsel services were offered

Defendants elected to take M.T. for an evaluation by Stuart Leeds, Psy. D. (ECF 55-7 at P-41; ECF 51-3 at R-19.) Dr. Leeds evaluated M.T. on January 15, 2020, and prepared a School-Based Threat Assessment that the District received on January 21, 2020. (*Id.*) Dr. Leeds made the following recommendations:

> [M.T.] should learn from home instruction until such time as an individual or group program can facilitate anger management techniques specifically for children with emotional and behavioral challenges.

> Psychotherapy with a trained professional in child behavior and family therapy to instill strong parenting boundaries with [M.T.] to assist with safety in the entire family.

> In-home therapy may be necessary to model strong behavioral incidents that may occur.

> [M.T.] would benefit from a smaller class environment with professionals able to immediately assist with Behavioral Management.

> It is possible that [M.T.] can attend the regular Randolph Township school if provided with a one-to-one Aide to assist with Behavioral Management and elopement risk.

(ECF 55-7 at P-41; ECF 51-3 at R-19). The District found the report did not provided the requisite clearance for M.T. to return to school and provided conflicting recommendations. (District's SUMF ¶ 56.) Dr. Leeds prepared a revised School-Based Threat Assessment on January 23, 2020, which the District received on January 27, 2020. (ECF 96 at R-21.) Dr. Leeds made the same recommendations as those in his initial report, but removed the recommendation that it was possible for M.T. to attend school in the District if he was "provided with a one-to-one Aide to assist with Behavioral Management and elopement risk." (*Id.*) Dr. Ciufalo, the school physician, was not satisfied with the report and did not sign off on M.T. being cleared to return. (Final Decision at 21, ¶ 44.)

---

and Linda McGovern, the director of Sage, was introduced. (Final Decision at 23, ¶ 60.) Defendants did not avail themselves of what Sage offered and relied upon the services provided through Stepping Forward.

On January 24, 2020, the parties met for their annual IEP meeting.[6] (Final Decision at 22, ¶ 52; ECF 55-3 at P-11; ECF 51-3 at R-20.)[7] On January 29, 2020, the District implemented a home instruction program for M.T. with a minimum of ten hours of instruction per week. (Final Decision at 21, ¶ 49; ECF 53-1 at R-65.) Defendants enrolled M.T. in Stepping Forward.[8] (Final Decision at 21, ¶ 48; ECF 55:8 at P-43.) The District agreed to pay for M.T.'s home instruction portion of his programming, which was ten hours per week, beginning on February 10, 2020. (ECF 53-1 at R-22.) Beginning on February 10, 2020, the District provided an additional two hours per week of home instruction. (ECF 53-1 at R-28.)

On March 13, 2020, upon the onset of the pandemic, an Executive Order was signed by the New Jersey Governor prohibiting in-person instruction and all schools statewide were closed. (Final Decision at 23, ¶¶ 71-72.) In response, the District provided M.T. with work to complete due to the school closing. (Final Decision at 24, ¶ 77; ECF 53-1 at R-38.) On March 23, 2020, the District home instructors reached out to I.T. to modify M.T.'s schedule to include the two hours of home instruction remotely per week. (ECF 53-1 at R-36.) M.T. hardly ever willfully participated in the online learning that was being provided through the district through the end of the school year. (Final Decision at 24, ¶ 78.) M.T. also refused to participate in speech services that the

---

[6] Prior to the IEP meeting, Defendants had M.T. evaluated by Jennifer Zeisz, Ph.D, a child and adolescent clinical psychologist. (ECF 55-17 at P-60.) Dr. Zeisz opined M.T. "present[ed] with a protracted history of neuro-developmental difficulties that are best captured by the diagnosis of an *autism spectrum disorder* (ASD) without intellectual impairments. (*Id.*) While Dr. Zeisz's report was provided to the IEP team prior to the meeting, the District did not accept Dr. Zeisz's finding and did not include her diagnosis in the IEP. (Final Decision at 23, ¶ 66.)

[7] The IEP provided: "For the 2020-2021 school year, pull-out resource replacement instruction will be in the Oasis classroom. The Oasis classroom will provide a small group, therapeutic setting supported by Sage Thrive. The Team feels this is the most appropriate setting as it will address M.T.'s academic needs, as well as his social-emotional well[-]being." (ECF 55-3 at P-11; ECF 51-3 at R-21.) The IEP also provided further support for M.T. in the sixth grade including continuation in group speech twice per week for forty minutes, school-based counseling twice per week for thirty-minutes, ongoing services from the in-district Sage counsel, and Extended School Year programing. (District's SUMF ¶ 72; EC ECF 55-3 at P-11; ECF 51-3 at R-21.)

[8] In a letter dated June 9, 2020, Dr. Nouriman Ghahary, Ph.D, LPC, a clinical psychologist, and Sarah Green, LSW, a therapist, indicated M.T. attended Stepping Forward from February 10, 2020 to May 21, 2020. (ECF 55-8 at P-44). The letter indicated M.T. "was not successful in making significant change." (*Id.*)

District had offered to resume in accordance with his IEP. (*Id.* at 24, ¶ 83.) I.T. continued to communicate with the District seeking additional help and guidance and expressed M.T. became more disengaged and essentially "shut down." (*Id.* at 25, ¶ 86.)

On June 10, 2020, Defendants signed an Enrollment Agreement for M.T. to attend Hampshire Country School ("Hampshire"), an out-of-state residential placement, for the 2020-2021 academic year. (Final Decision at 25, ¶ 90; ECF 55-14 at P-53.) On June 23, 2020, Defendants sent the District a unilateral placement letter indicating they would be enrolling M.T. at Hampshire. (Final Decision at 25, ¶ 91; ECF 55-14 at P-57.) Defendants filed a due process petition on July 14, 2020, seeking compensatory education and reimbursement for M.T. and for the District to pay for M.T.'s placement "until at least the end of [eighth] grade, including all summer programs if he is able to participate in them." (ECF 97.)

### C.  The Administrative Process

An administrative due process hearing was held before the ALJ over the course of eight days: February 10, 2021, March 2, 2021, March 3, 2021, April 28, 2021, April 30, 2021, May 3, 2021, July 19, 2021, and Jule 21, 2021. (Final Decision at 1-2.) The two issues before the ALJ were (i) whether the District denied M.T. a FAPE for 2019-2020 academic year (fifth grade) and 2020-2021 academic year (sixth grade), and (ii) whether M.T.'s unilateral placement at Hampshire was appropriate under the circumstances. (*Id.*) On February 22, 2022, the ALJ issued a forty-one page written decision, ruling in favor of Defendants and found the District failed to provide M.T. a FAPE. (Final Decision at 26). Specifically, the ALJ awarded Defendants compensatory damages for M.T.'s placement and tuition at Hampshire, reimbursement for travel and expenses related to M.T.'s placement at Stepping Forward, and costs related to the services of M.T.'s doctors. (*Id.* at

27, 36). The ALJ also ordered the District to create an updated IEP to reflect M.T.'s placement at Hampshire. (*Id.*)

### D. Proceedings in this Court

On March 30, 2022, the District filed a complaint in this Court challenging the ALJ's findings and decision. (*See generally* ECF 1.) On May 20, 2022, Defendants filed their answer and counterclaim against the District, whereby they sought (1) enforcement of the ALJ's February 22, 2022 Order, (2) declaration as the prevailing party of the administrative action, (3) attorneys' fees and costs and expert fees and costs associated with the administrative action and federal action, and (3) other relief as the Court deemed just and proper. (*See generally* ECF 4.) Defendants also filed an order to show cause, whereby they sought to enforce the judgment and hold the District in contempt. (ECF 4-3.) On May 24, 2022, the District filed an order to show cause to stay enforcement of the February 22, 2022 Order pending the outcome of this action. (ECF 5) Both parties filed oppositions to the respective motions (ECF 13; ECF 15) and replies. (ECF 16; ECF 17.) On June 7, 2022, the District filed an answer to the counterclaim. (ECF 14.) On July 21, 2022, the Court denied the District's motion to stay the judgment. (ECF 24.) Thereafter, the District filed an appeal of the Court's July 21, 2022, which was subsequently denied by the United States Court of Appeals for the Third Circuit on June 29, 2023. (ECF 80.)

On November 30, 2022, the parties both filed motions for summary judgment. (ECF 46; ECF 47.) On November 11, 2023, both parties filed oppositions to the respective motions (ECF 63; ECF 64). On February 1, 2023, both parties filed replies. (ECF 66; ECF 67.)

## II.    STANDARD OF REVIEW

Under Rule 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." The mere existence of an alleged disputed fact is not enough. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Rather, the opposing party must prove that there is a genuine dispute of a material fact. *Id.* at 247-48. An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. A fact is "material" if under the governing substantive law, a dispute about the fact might affect the outcome of the lawsuit. *Id.* Factual disputes that are irrelevant or unnecessary will not preclude summary judgment. *Id.* The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the non-moving party. *See Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

The standard of review "under which this Court considers an appeal of a state administrative decision under the IDEA 'differs from that governing the typical review of summary judgment.'" *M.A. ex rel. G.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002), *aff'd*, 65 Fed. App'x. 404 (3d Cir. 2003) (quoting *Heather S. v. State of Wis.*, 125 F.3d 1045, 1052 (7th Cir. 2002)). "When deciding an IDEA case, the District Court applies a modified version of *de novo* review and is required to give due weight to the factual findings of the ALJ." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006); *Upper Freehold Regional Bd. of Educ. v. T.W.*, 496 Fed. App'x 238, 242 (3d Cir. 2012); *Shore Reg'l*, 381 F.3d at 199 (noting that the District Court "must make its own findings by a preponderance of the evidence" but "also afford 'due weight' to the ALJ's determination"); *see also Rowley*, 458 U.S. at 206 ("[D]ue weight shall be given to [state administrative] proceedings."); *Carlisle*, 62 F.3d at 529 (stating that "due weight" means to "consider—although not necessarily to accept—the administrative fact findings").[9] Nonetheless, a district court's review of legal questions is plenary. *See Carlisle*, 62

---

[9] Where, as here, a district court reviews administrative fact finding without hearing additional evidence, it is "required to defer to the ALJ's factual findings unless it can point to contrary nontestimonial extrinsic evidence in

F.3d at 528 n.3; *D.B. v. Ocean Twp. Bd. of Educ.*, 985 F. Supp. 457, 500 (D.N.J. 1997), *aff'd*, 159

F.3d 1350 (3d Cir. 1998). And the court may reject the findings of an ALJ, *Carlisle*, 62 F.3d at

529, if it "fully explain[s] its reasons" for doing so. *S.H.*, 336 F.3d at 271.

Relevant here, district courts cannot "substitute their own notions of sound educational

policy for those of the school authorities." *Rowley*, 458 U.S. at 206. Indeed, "courts lack the

'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of

educational policy.'" *Id.* at 208 (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1,

42 (1973)). As such, when the administrative body does not adequately explain its findings, the

district court may remand the matter for further development. *See, e.g.*, *Upper Freehold Reg'l,* 496

F. App'x at 244-45; *Livingston Bd. of Educ. v. D.A. o/b/o D.A.*, No. 17-8802, 2021 WL 3706723,

at *5 (D.N.J. Aug. 20, 2021).

## III.   DISCUSSION

While the February 22, 2022 Final Decision is thirty-seven pages long, remand is necessary

in this matter given the ALJ's scant explanation that fails to adequately point to either legal or

evidentiary support. During the hearing, the ALJ heard testimony from nine witnesses and 140

exhibits were introduced into evidence. The "FINDINGS OF FACT" section spans nearly eleven

pages, and the ALJ made ninety-three factual findings, but failed to cite or point to testimony from

the voluminous record or witnesses. (Final Decision at 17-27.) The ALJ made several factual

conclusions:

> 93. Approximately thirty days later, [Defendants] filed their due process petition.
> Based on a series of actions by the District following M.T.'s elopement on January
> 14, 2020, I **FIND** that the District did not provide FAPE to M.T. in the least
> restrictive environment following the incident, which the District itself deemed

the record." *S.H.*, 336 F.3d at 270. The purpose of such a deferential standard is to ensure that federal courts do not impose their own "view of preferable educational methods upon the States." *Rowley*, 458 U.S. at 207. Similarly, the court "'must accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion.'" *D.K.*, 696 F.3d at 243 (quoting *Shore Reg'l*, 381 F.3d at 199).

isolated. I **FIND**, that once the District's physician indicated that Dr. Leeds' report was not sufficient for M.T. to return to school, placing M.T. on home instruction for an indefinite period, without a re-entry plan, put him in a more restrictive environment than the IEP which was in place at the time, and I **FIND** it denied M.T. FAPE. I **FURTHER FIND** that the District's unwilling to consider a diagnosis of Autism for M.T., and/or the failure to seek an independent evaluation on this diagnosis also constitutes a violation of FAPE, as it may have changed the IEP which was proposed on January 24, 2020, and I **FURTHER FIND**, that since talk therapy was a key component of the Oasis/Sage program being offered by the District for sixth grade, and with evidence throughout that M.T. did not benefit over the years from talk therapy that this program did not meet the District's obligations to M.T. under FAPE.

I **FURTHER FIND**, that the District failed to meet its FAPE obligations to M.T. following the January 14th elopement, by virtue of its failure to make additional attempts to have the school physician communicate with Dr. Leeds and [Defendants], so that clearance could be obtained leading towards re-entry to the school before the onset of the pandemic on March 13, 2020.

And, while the District did not identify M.T.'s time away from school as a suspension, once the initial ten day period passed after the elopement, no hearing, formal or informal was offered to determine if M.T. could return to school, instead of remaining on home instruction, which constitutes a violation of his due process rights, and the District's obligations under FAPE.

I **FURTHER FIND** that during the "ten-day window" after proper notice was given by [Defendants] to the District in June 2020 about the placement, the District took no actions to learn more about the placement, and/or to propose an alternative either within or outside the District. I **FIND** that the only action the District took during this statutory mandated period was to prepare itself to defend its position in litigation instead of entertaining an open dialogue with [Defendants] about other placement options that might be less costly and would have allowed M.T. to remain closer to home. Again here, I **FIND** that M.T.'s due process rights were violated and the District ignored its obligations under FAPE, by virtue of its failure to discuss options with the family during the ten[-]day notice period.

As such, I **FIND** [Defendants] are entitled to full reimbursement of their placement cost at Hampshire commencing August 2020, including but not limited to tuition and travel expenses. I also **FIND** [Defendants] are entitled to reimbursement for travel and any related expenses while M.T. was enrolled in Stepping Forward, from January 2020 through March 13, 2020. It is unknown and not part of the submissions as to whether M.T. continued his enrollment at Hampshire for the 2021-2[2] school year, and whether or not the District convened another meeting with the parties during this time, and whether another due process petition was filed. As such, the finding applies to the 2020-21 school year placement, subject to further review in another forum if appropriate.

I further **FIND** that the District violated FAPE under IDEA and under Section 504. Therefore, [Defendants] are entitled to reimbursement of all costs related to the private evaluations and expert witnesses identified herein. As such, I further **ORDER** that [Defendants] be reimbursed for these expenses.

I **DO NOT FIND** that [Defendants] and M.T. are entitled to compensatory education for the period of March 13 2020 through June 2020 when schools were closed as the Department of Education created uniform instructions to districts on how to handle virtual instruction, and both M.T. and [Defendants] did not avail themselves of the services and education that was being offered by the District in this three month period after schools were closed.

(Final Decision at 26-27.)

Next, the Final Decision provides the ALJ's "LEGAL ANALYSIS AND CONCLUSIONS." After reciting the relevant legal framework, the ALJ made several legal conclusions:

There are several overriding factors that M.T. did not receive FAPE, and would not have done so had he returned to school in September 2020 and enrolled in Oasis.

The record is replete with evidence that the District's position starting in January 2020 was at best, inconsistent. The IEP that was offered did not include a Behavioral Assessment, and the District never offered to modify it ten days after he eloped, and even before the end of the 2020 school year while he was on home instruction before the Pandemic ensued. At the IEP meeting which took place ten days after the elopement incident, no-reentry program for a return date to school was processed by the District and M.T. and home instruction is more restrictive than being in school. M.T. remained under home instruction without a path to physically return to his school for sixty days, until the onset of the pandemic, when all learning went virtual. I further **CONCLUDE** that with the District's refusal to engage in discussions about other out-of-district placements options after receipt of the ten day notice, [Defendants] were well within their rights to make the determination that M.T. should be enrolled at the Hampshire School, effective September 2020.

(*Id.* at 32.)

After analyzing the ten-day notice period required by N.J. Admin. Code § 6A:14-2.10(c), the ALJ seemingly continued his legal analysis regarding FAPE by concluding:

Several of the goals and objectives in the IEP were not appropriate because M.T. lacked the prerequisites for those goals and the criteria for mastery did not require independent mastery and therefore were not appropriate to establish meaningful progress. But after consideration of all the testimony and evidence, I **CONCLUDE** that the District did not sustain its burden that M.T. was receiving FAPE in the Least Restrictive Environment, and that M.T.'s rights under Section 504 were violated. I therefore **CONCLUDE** that [Defendants], are the prevailing party in this matter.

Based upon the testimony and documentary evidence, I **CONCLUDE** that the District's IEP was not appropriate to meet M.T.'s educational needs for the 2020-2021 school year, and did not provide him with a FAPE.

(*Id.* at 33.)

Furthermore, in regard to Defendants' request for reimbursement, the ALJ concluded, without providing any analysis, that Defendants should be reimbursed

for the cost of M.T.'s placement at the Hampshire School, together with reimbursement for the time and expense related to the retention of Dr. Ziesz, and Dr. Katz, and the costs associated with the Morris Psychological Group threat assessment, since the District took no steps thereafter to find a method of re-entry for M.T. up to the onset of the pandemic, almost sixty days after the initial incident.

(*Id.* at 35.)

The Court is unable to conduct a meaningful review of the ALJ's factual findings and legal conclusions as stated in the Final Decision. First, after hearing testimony from nine witnesses over the course of eight days, the Final Decision simply recounts testimony without making discernable credibility determinations. (*See id.* at 3-17.) Prior to outlining his factual findings, the ALJ referenced "mak[ing] credibility determinations based on the witnesses' testimony[.]" (*Id.* at 17.) However, upon reviewing the ALJ's decision, the Court finds the ALJ made no credibility findings regarding any of the witnesses that testified throughout the hearing. Rather, a thorough review of the record indicates the ALJ only referenced the credibility of one of the witnesses during the cross-examination of Ms. Sobota. (*See* ECF 51-6, Feb. 10, 2021 Hearing at 114:15 to 19; ECF 51-6, March 2, 2021 Hearing at 66:14 to 20.)  While addressing the parties' attorneys throughout Ms.

Sobota's testimony, the ALJ expressed: "this witness seems to be extremely credible in her overall demeanor at least" (ECF 51-6, Feb. 10, 2021 Hearing at 114:17 to 19,) and "Ms. Sobota [however] calmly, very patiently, very credibly answered the best of her ability each and every one of my questions from Ms. Warshaw[.]" (ECF 51-6, March 2, 2021 Hearing at 66:14 to 20 66:15 to 18.) Thus, it is entirely unclear from the Final Decision the weight afforded by the ALJ to the witnesses' testimony.

Second, the ALJ's factual findings are not explained by any citations to the record or pertinent testimony. (Final Decision at 17-27.) The ALJ seemingly intertwines its finding that M.T. was deprived a FAPE with the finding that M.T. was denied a FAPE in the least restrictive environment. (*Id.* at 26.) The ALJ also found that the District did not meet its obligations under FAPE because "a key component of the Oasis/Sage program being offered by the District for sixth grade" was talk therapy and there was "evidence throughout that M.T. did not benefit from talk therapy." (*Id.*) Again, the ALJ fails to cite to the record or any testimony to support this finding. Similarly, there is no explanation why Defendants' placement of M.T. was appropriate, which is necessary for a finding of reimbursement. Furthermore, the ALJ found the District violated FAPE "under Section 504" without any factual analysis. (Final Decision at 27.) As such, the Court cannot discern the basis for the ALJ's findings.[10]

Third, because the ALJ's conclusion hinges on undeveloped factual findings, the Court similarly cannot discern its basis. The ALJ concluded M.T. was denied a FAPE, but fails to cite to any record evidence or testimony before doing so. For instance, the Court found "[s]everal of the

---

[10] The ALJ also found M.T. was denied a FAPE because of the District's "unwillingness to consider a diagnosis of Autism for M.T., and/or the failure to seek an independent evaluation on this diagnosis[.]" (Final Decision at 26.) The District argues the ALJ "rendered this conclusion without making any findings that M.T. had educational needs the District had not identified or that he needed different programmed for as a result." (ECF 47-1 at 23.) It is entirely unclear from the ALJ's factual findings whether an autism diagnosis would have modified the January 24, 2020 IEP.

goals and objectives in the IEP were not appropriate," but fails to identify the "goals and objectives." (Final Decision at 33.) Without providing a thorough analysis for reaching this conclusion, this Court is unable to engage in a meaningful review. On remand, the ALJ shall amplify its reasoning for M.T. being denied a FAPE for January 2020 through June 2020 and for the 2020-2021 school year.[11]

Similarly, the ALJ concluded that "the District did not sustain its burden that M.T. was receiving FAPE in the Least Restrictive Environment[.]" (Final Decision at 33.) However, the ALJ did not conduct an LRE analysis separate from the FAPE analysis. *See A.G. ex rel S.G. v. Wissahickon Sch. Dist.*, 374 F. App'x 330, 334 (3d Cir. 2010) ("FAPE and LRE are distinguishable[.]"); *D.E.R. v. Bd. of Educ. of Borough of Ramsey*, No. 04-2274, 2005 WL 1177944, at *6 (D.N.J. May 18, 2005) ("Inquiry into the LRE cannot be dismissed as immaterial before the LRE requirement is critical under the IDEA."). In other words, the ALJ did not consider whether the District made efforts to include M.T. in an integrated classroom with supplementary aides and services in either January 2020 through June 2020 or for the 2020-2021 school year when concluding M.T. was denied a FAPE. Thus, the Court also instructs the ALJ to consider this issue on remand.

Furthermore, this Court agrees with the District that the ALJ concluded the District violation Section 504 of the Rehabilitation Act of 1973 ("Section 504") without providing any legal analysis.[12] The ALJ did not outline any legal authority for a Section 504 violation or outline

---

[11] The ALJ found the District denied M.T. a FAPE because of its "unwillingness to consider a diagnosis of Autism for M.T., and/or failure to seek an independent evaluation on this diagnosis." (Final Decision at 26.) Defendants assert the District's failure to evaluate M.T. in all areas of suspected and known disabilities denied M.T. FAPE. (ECF 46-1 at 9.) The District contests this issue was raised in its petition. (ECF 64 at 5.) As the Final Decision provides a scant analysis for finding and concluding M.T. was denied a FAPE, it is unclear what, if any, impact the ALJ's finding that the District's failure to consider the autism diagnosis or to evaluate M.T. had on his IEP. On remand, the ALJ shall further supplement his findings.

[12] Section 504 of the Rehabilitation Act "protects the rights of disabled children by prohibiting discrimination against students on the basis of disability." *P.P.*, 585 F.3d at 735. Section 504 provides that an individual with a

how the District violated M.T.'s rights under Section 504. (ECF 64 at 28.)  Rather, the ALJ concluded: "But after consideration of all the testimony and evidence, I **CONCLUDE** that the District did not sustain its burden that M.T. was receiving FAPE in the Least Restrictive Environment, and that M.T.'s rights under Section 504 were violated." (Final Decision at 33.) "[A] plaintiff's Section 504 . . . claim[ ] [is] not necessarily subsumed into an IDEA claim." *E.R. v. Ridgefield Park Bd. of Educ.*, No. 19-1221, 2020 WL 3097473, at *8.  As such, on remand, the ALJ shall set forth an analysis for his conclusion that M.T.'s rights were violated under Section 504.

Finally, the ALJ ordered the District to reimburse Defendants for the cost of M.T.'s placement at Hampshire. (Final Decision at 35.) As the Court previously expressed in its July 21, 2022 Letter Opinion denying the District's motion to stay, the ALJ failed to separately consider the appropriateness of Hampshire as a placement for M.T. (*See* ECF 24 at 4.) "[P]arents who . . . 'unilaterally change their child's placement during the pendency of [IDEA] review proceedings' . . . are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." *Florence*, 510 U.S. at 15 (quoting *Burlington*, 471 U.S. at 373-74 (1985)). The Final Decision does not include any analysis addressing whether Hampshire provided M.T. a FAPE. The ALJ also did not explain or analyze whether Hampshire was an appropriate placement for M.T. in light of his unique educational needs. This analysis is necessary in order for the ALJ to require the District to reimburse Defendants.

---

disability "shall [not], solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a).

In short, the ALJ's failure to adequately explain his factual findings or legal conclusions leaves the Court with more questions than answers. As a result, the Court cannot meaningfully review the ALJ's Final Decision. *See, e.g.*, *H.L. o/b/o V.L. v. Marlboro Twp. Bd. of Educ.*, No. 16-9324, 2017 WL 5463347, at *9 (D.N.J. Nov. 14, 2017). It is not the Court's role to sift through the parties' conflicting interpretations of the evidence and make credibility assessments in the first instance without the benefit of having observed the witnesses. *See B.G. v. Ocean City Bd. of Educ.*, No. 13-5166, 2014 WL 4798647, at *8 (D.N.J. Sept. 26, 2014) (noting that "in the first instance it is appropriate for the ALJ to address [such] issues"). Significant here, this Court lacks the "'specialized knowledge and experience'" necessary to resolve "'persistent and difficult questions of educational policy[,]'" and "must be careful to avoid imposing [its] view of preferable educational methods upon the State[]." *See Rowley*, 458 U.S. at 207-08 (quoting *San Antonio Indep.*, 411 U.S. at 42). As such, the appropriate remedy is to remand this matter.[13]

Accordingly, the Court remands this matter to the ALJ to supplement the Final Decision. On remand, the ALJ should first explain the basis for finding that the January 24, 2020 IEP did not meet M.T.'s unique needs from January 2020 through June 2020 and for the 2020-2021 school

---

[13] While the District argues that if the matter must be remanded it should be before a different ALJ than the one who decided this matter, (ECF 47-1 at 35,) the Court declines to order this matter to be heard by another ALJ. Consistent with this opinion, the Court is directing the ALJ to supplement his reasoning as he is within the position to provide fulsome explanations for his factual findings. Akin to other courts in the District of New Jersey, it is far more prudent to remand this matter so that the ALJ can provide fulsome explanations for his factual findings and legal conclusions while utilizing his specific knowledge and experience. *See, e.g.*, *H.L.*, 2017 WL 5463347, at *8 n.8 (citing *Upper Freehold Reg'l*, 496 F. App'x at 244-45); *R.S. v. Montgomery Twp. Bd. of Educ.*, No. 10-5265, 2012 WL 2119148, at *7 (D.N.J. June 11, 2012) (remanding to the ALJ "for redetermination of whether plaintiff received a FAPE" because the court was "left with the impression that the factual record need[ed] ... further develop[ment]"); *see also Christine C. v. Hope Twp. Bd. of Educ.*, No. 18-3984, 2021 WL 363743, at *13 (D.N.J. Feb. 2, 2021) (collecting cases from other district and circuit courts); *accord R.R. v. Manheim Twp. Sch. Dist.*, 412 F. App'x 544, 549 (3d Cir. 2011) ("There is a reason for insisting on administrative review and the heightened level of deference accorded to its results: judicial review is 'by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" (quoting *Rowley*, 458 U.S. at 206)); *Carlisle*, 62 F.3d at 526 ("To prohibit the *court* from remanding for clarification would impair the court's ability to review the decision fairly . . . . ").

year. In doing so, the ALJ shall clarify the testimony, make necessary credibility assessments, and reference specific evidence in support of the findings. At this point, if the ALJ still concludes that the District did not offer M.T. a FAPE, the District must also consider and adequately explain whether Defendants' unilateral placement of M.T. at Hampshire was appropriate under the circumstances.

## IV.    CONCLUSION

For the reasons set forth above, the Court **DENIES** the District's motion for summary judgment, **DENIES** Defendants' motion for summary judgment, and **REMANDS** this matter to the Administrative Law Judge for further proceedings consistent with this Opinion. An appropriate Order accompanies this Opinion.


*/s/  Jamel K. Semper*
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:        Clerk
cc:          Cathy L. Waldor, U.S.M.J.
             Parties